UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| MICHAEL AMARITE, | ) |  |  |
|---|---|---|---|
| Plaintiff, | ) |  |  |
| v. | ) | No.: | 2:20-CV-116-RLJ-CRW |
| GREENE COUNTY, TENNESSEE, et al., | ) |  |  |
| Defendants. | ) |  |  |

## MEMORANDUM OPINION

Defendants Greene County, Tennessee ("County") and Greene County Sheriff's Department (collectively "Entity Defendants"), along with Kevin Morrison, Wesley Holt, Roger Willett, and Eric Cutshall (collectively "Individual Defendants") have filed a motion for summary judgment in this prisoner's civil rights action for violation of 42 U.S.C. § 1983 [Doc. 37]. Michael Amarite ("Plaintiff") has filed a response in opposition to the motion [Doc. 53], and Defendants have filed a reply thereto [Doc. 64]. Upon consideration of the parties' pleadings, the competent summary judgment evidence, and the applicable law, the Court finds that summary judgment should be **GRANTED** in part as to Plaintiff's federal claims and **DENIED** in part as to Plaintiff's claims arising under state law, and this action should be **DISMISSED**.

I.   **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is deemed "material" if resolving that fact in favor of one party "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish an entitlement to summary judgment, the moving party must

demonstrate that the nonmoving party cannot establish an essential element of his case for which he bears the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 322; *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).

Once the motion is properly supported with competent evidence, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact. *Anderson*, 477 U.S. at 248. If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 889 (1990)).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Advisory Committee Note to the 1963 Amendments to Rule 56. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The non-moving party (the plaintiff in this case), must come forward with proof to support each element of his claim. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan*, 497 U.S. at 888, or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at 252. It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888. Therefore, in considering a motion for summary judgment, a court must determine whether the non-moving party's allegations are *plausible. Matsushita,* 475 U.S. at 586. (emphasis added). "[D]etermining whether a complaint states a plausible claim for relief. . .

[is] context-specific[,] . . . requir[ing] the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (discussing plausibility of claim as a requirement to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)).

Once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . [the ultimate decision becomes] . . . a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on the motion for summary judgment." *Id.* at 380.

## II.     UNREFUTED SUMMARY JUDGMENT EVIDENCE

Plaintiff was assaulted by inmates Tyler Rogers and Tyler Brown in the A-pod of the Greene County Detention Center ("Detention Center") on June 18, 2019 [*See* Doc. 37-2]. Plaintiff had been housed at the Detention Center for approximately two weeks prior to this assault, having been booked into the Detention Center on June 3, 2019, after he was arrested on charges of criminal impersonation, theft, and a violation of probation from prior convictions [Doc. 37-1]. During the intake process and subsequent physical, Plaintiff did not disclose any medical or mental issue or disability [Doc. 37-3; Doc. 37-8 at 66].

After the booking process was completed, Plaintiff was temporarily placed in a holding cell before he was assigned to B-pod, a unit where inmates are allowed free movement all day and are locked down in their cells only at night [Doc. 37-4 ¶ 3]. Plaintiff was in B-pod for one day before he reported being "jumped on" by some unknown prisoners and requested to be transferred for his own safety [Doc. 37-4 ¶ 3; Doc. 37-8 at 24, 26-27]. While Plaintiff did not know who assaulted him, he knew it was not Brown or Rogers, as neither were in B-pod at the time [Doc. 37-4 ¶ 3; Doc. 37-8 at 26]. On June 4, 2019, Plaintiff was transferred to A-pod [Doc. 37-4 at 8].

A-pod is an eight-cell "lockdown" pod where inmates are confined to their cells for twenty-three hours per day, and each cell is separately opened for one hour per day to allow inmates to shower, exercise, buy commissary, or seek any necessary medical attention [Doc. 37-4 ¶ 14; *see also* Doc. 37-2]. In A-pod's common area, a window is accessible where inmates may seek medical attention while they are out of lockdown [Doc. 37-4 ¶ 14]. Inmates are advised during the booking process that should a need for medical care arise while they are on lockdown, they are to alert an officer making rounds that they need care [*Id.*]. Inmates are also advised that, in an emergency that occurs during lockdown, that they are to wave (or have another inmate wave) a towel or piece of clothing outside the cell so that it can be seen on the surveillance cameras [*Id.*].

A-pod, along with three "open" pods identified as pods B-D, are observed by a single officer assigned to the "tower," a centrally located, elevated, and enclosed area away from the pods [Doc. 37-5 ¶¶ 7-8]. There are two surveillance cameras in every pod, for a total of eight camera views that the tower officer observes via monitors on two separate walls [Doc. 57-1 at 6, 7-8]. Officer Eric Cutshall was the officer in the tower at all times relevant to this action [*See, e.g.*, Doc. 37-4 ¶ 5].

In the Detention Center, inmates routinely manipulate cell doors to prevent them from locking [Doc. 37-10 at 2-3; Doc. 37-11 at 4]. Specifically, inmates place items, such as bottle caps, toilet paper, milk cartons, etc., into the "well" of the cell doors to prevent the lock from engaging when the door is shut [Doc. 37-10 at 2-4; Doc. 37-11 at 4; Doc. 57-1 at 9-11]. Officers are trained to pull on the cell doors while doing rounds to make sure the cells are actually locked [Doc. 37-10 at 4]. Maintenance crews routinely enter the pods to check the doors and remove contraband items to ensure the cells lock properly [Doc. 37-10 at 3; Doc. 37-11 at 4-5]. In the event of an emergency, officers can submit a priority maintenance request to get immediate repair to cell doors [Doc. 37-11 at 5]. Given the frequency with which inmates attempt to defeat the locking mechanism, the cell doors require constant maintenance [Doc. 57-2 at 12].

Plaintiff did not know anyone in A-pod when he arrived there on June 4, 2019 [Doc. 37-8 at 27]. At that time, Tyler Brown was already housed in A-pod [Doc. 37-4 at 10]. Plaintiff was housed in A-pod for approximately two weeks before Tyler Rogers' arrival in the pod on June 14, 2019 [Doc. 37-4 at 11].[1] At no time prior to June 18, 2019, did Plaintiff advise any of the individually named Defendants that he was in fear for his own safety in A-pod from Rogers, Brown, or any other individual [*See* Doc. 37-4 ¶¶ 3, 8; Doc. 37-5 ¶ 4; Doc. 37-6 ¶¶ 4, 8; Doc. 37-7 ¶ 4; Doc. 37-8 at 28-29]. Plaintiff never submitted any written requests asking to be moved from A-pod or not to be housed near Brown or Rogers [Doc. 37-8 at 29, 31-32].

At approximately 6:00 a.m. on the morning of the assault, all of A-pod was taken to the gym so that maintenance crews could conduct any necessary repair to the jail cell doors, including the cell door where Rogers and Brown resided [Doc. 37-4 ¶¶ 10-11; Doc. 37-4 at 12]. While in the gymnasium, the offenders were grouped together without separation under the observation of one officer [Doc. 37-4 ¶ 10; Doc. 37-8 at 41-42]. Brown and Rogers were in the gymnasium with Plaintiff, but Plaintiff did not have any fear of Brown or Rogers at that time, and thus, he did not ask the correctional officer on duty for protection from them [Doc. 37-8 at 42]. The cell doors in A-pod were found to be in proper working order after the maintenance visit [Doc. 37-4 ¶ 11].

Sometime later that day, Plaintiff's cell door on the bottom floor of the pod was opened for his one-hour free period, while Rogers and Brown were in a closed cell upstairs [*See, generally,* Doc. 37-2]. A surveillance video shows one of the assailants opening his cell door before quickly shutting it behind him and entering the pod [Doc. 37-2, 20:22-20:31]. That assailant and Plaintiff exchange words in the common area of the pod as Plaintiff stands near his own cell door brushing his teeth [*Id.* at 21:04-21:23]. Plaintiff enters his cell, and thereafter, the second assailant opens his cell door and

---

[1] One exception to Plaintiff's continuity of housing in A-pod occurred on June 9, 2019, when Plaintiff was moved to a holding cell before being returned to the same cell in A-pod on June 10, 2019 [Doc. 37-4 at 9]. The move had nothing to do with Rogers or Brown [Doc. 37-4 ¶ 3].

proceeds down the stairs and into Plaintiff's cell [*Id*. at 21:21-21:34]. The other assailant follows into Plaintiff's cell [*Id*.]. A fight ensues between Plaintiff and the assailants, and all three move out of view of the surveillance video within seconds of the first punch being thrown [*Id*. at 21:40-21:45]. The video shows that approximately twenty seconds after the fight began, Brown and Rogers exit Plaintiff's cell and return to their own cell upstairs, where they shut their cell door [*Id*. at 22:00 - 22:20]. Officer Cutshall did not see the assailants leaving their cells or the subsequent assault on Plaintiff; in fact, he did not know Plaintiff had been in an altercation until after Plaintiff was transported for medical treatment [Doc. 37-5 ¶ 5; Doc. 57-1 at 6, 14].

Plaintiff suffered facial injuries as a result of the assault, but he suffered no injuries to his legs and could walk [Doc. 37-8 at 14, 22, 56]. Plaintiff's cell door remained open for at least thirty minutes after the assault [*Id*. at 59]. However, Plaintiff did not seek medical assistance at the window during that time, nor did he subsequently wave (or have a cellmate wave) a towel or clothing to notify the tower officer of a need for medical attention [Doc. 37-4 ¶ 14; Doc. 37-8 at 59]. Rather, immediately after the assault, Plaintiff laid down on a bunk in the back of his cell where he was not visible to surveillance cameras and completely covered himself with a blanket [Doc. 37-8 at 56-57; Doc. 37-5 ¶ 6].

Approximately an hour after the assault, a cellmate came to check on Plaintiff and said Plaintiff needed to see a nurse [Doc. 37-8 at 56-57]. The cellmate flagged down Officer Joe Harness, the officer making rounds [Doc. 37-4 ¶ 14; Doc. 37-8 at 57]. Harness promptly provided Plaintiff with medical attention, and thereafter, Plaintiff was transported to the hospital, where his chest was x-rayed and injuries to his face were treated [Doc. 37-4 ¶ 14; Doc. 37-8 at 37-38, 60-61]. Plaintiff was released back to the Detention Center the same day, where he was sent to the medical pod and provided ibuprofen [Doc. 37-8 at 38-39]. Plaintiff never returned to A-pod at any time before his release on August 20, 2019, and Brown and Rogers were subsequently charged and convicted of the

6

assault on Plaintiff [*Id*. at 8, 39]. Thereafter, Detention Center staff provided Plaintiff with transportation to his medical appointments and treated him when he made complaints of pain [*Id*. at 35-36, 67].

Plaintiff worked at the Detention Center as a trustee and would daily leave the jail to perform various job tasks, including weed-eating, cleaning garages, and washing vehicles [*Id*. at 73-75]. During the time Plaintiff was named a trustee through the date he was released from imprisonment, he did not miss a single day of work [*Id*. at 76]. Plaintiff never had any problems physically performing his job [*Id*. at 77]. No physician ever told Plaintiff he should not continue to work [*Id*. at 40].

Plaintiff had no prior physical altercation with either of his assailants before June 18, 2019, and he never disclosed to any Individual Defendant that he feared for his health or safety as a result of being housed near Rogers, Brown, or any other inmate in A-pod [Doc. 37-4 ¶ 8; Doc. 37-5 ¶ 4; Doc. 37-6 ¶ 4; Doc. 37-7 ¶ 4; Doc. 37-8 at 31-32]. Plaintiff had no knowledge that either assailant had been in any violent altercations with anyone else prior to the June 18, 2019, assault on Plaintiff [Doc. 37-8 at 52].

The Tennessee Corrections Institute ("TCI")[2] provides governance and issues requirements to correctional facilities in Tennessee, including the Detention Center [Doc. 37-6 ¶ 3]. The training of all Detention Center staff and its correctional officers at all relevant times complied with the requirements of the TCI [*Id*.]. The TCI performs unannounced, annual inspections of correctional facilities in Tennessee, including the Detention Center [*Id*.]. The TCI has approved the policies and

---

[2] "The Tennessee Corrections Institute, established by state statute, is required to establish minimum standards for adult local jails, lock-ups, workhouses, and detention facilities in the State; establishes the standards to inspect and certify local correctional facilities; is responsible for educating local correctional staff; and provides technical assistance and conducts research in relation to requests from local correctional detention facilities, the Tennessee legislature, and other state agencies." *Morrow v. Montgomery Co. Sheriff's Dept*., No. 3:12-CV-801, 2012 WL 3561069, at *3 (M.D. Tenn. Aug. 16, 2012); *see also* Tenn. Code Ann. § 41-4-140.

procedures manual for the Detention Center [Doc. 37-4 ¶ 7]. During the multiple years Roger Willett has been the jail administrator at the Detention Center, the TCI has never suspended, withdrawn, or in any other manner removed its certification for the Detention Center [*Id*. at ¶¶ 11, 12].

## III. DISCUSSION

### A. Individual Defendants

In order to demonstrate liability under § 1983 as to any defendant, a plaintiff must first establish that the defendant acted under color of state law, and that his actions violated the rights secured by the Constitution and/or laws of the United States. *See, e.g., Baker v. McCollan,* 443 U.S. 137, 140 (1979). The plaintiff must also make a clear showing that the particular defendant was personally involved in the activity that forms the basis of the complaint. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government official defendant, through the official's own individual actions, has violated the Constitution.").

Defendants have pled the defense of qualified immunity against the claims against them individually. Qualified immunity protects governmental employees from individual, civil liability as long as their conduct does not violate clearly established "constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An evaluation of qualified immunity requires the Court to conduct a three-pronged inquiry: (1) whether there was a constitutional violation; (2) whether the violated right was "clearly-established"; and (3) whether the official's actions were objectively unreasonable. *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). The Court may address these prongs in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A right is clearly established where, "at the time of the officer's conduct, the law was sufficiently clear such that every reasonable official would understand what he is doing is unlawful."

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Once qualified immunity has been pleaded by a defendant, the plaintiff bears the burden of overcoming the defense by showing both "that the challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (citing *Ashcroft*, 563 U.S. at 741). In short, it is a defense that protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Because he was a convicted prisoner at the time of the incidents giving rise to this suit, Plaintiff's treatment by Defendants is "subject to scrutiny under the Eighth Amendment." *Rhodes v. Michigan*, 10 F.4th 665, 673 (6th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Under the Eighth Amendment, a prison official has a duty to "ensure that inmates receive adequate food, clothing, shelter and medical care and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832. However, in cases where a plaintiff is challenging the level of protection from inmate violence or medical treatment provided, "not every harm or injury suffered in prison rises to the level of cruel and unusual punishment: 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Rhodes*, 10 F.4th at 673 (citing *Farmer*, 511 U.S. at 834). Instead, in circumstances like the ones presented here, the Eighth Amendment is violated only where a plaintiff demonstrates that "the prison officials acted with 'deliberate indifference' to a substantial risk [of] serious harm." *Id.* (citation omitted).

Deliberate indifference has both objective and subjective components. *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021). The objective prong is satisfied if a plaintiff shows he had a substantially serious medical need, or that he was exposed to a deprivation causing a substantial risk of serious harm. *Id*. (citation omitted).

In contrast, the subjective component is an inquiry into the defendant's state of mind. *Rhodes*, 10 F.4th at 674. Under the subjective standard, Eighth Amendment liability attaches only where it is shown that the "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rhodes*, 10 F.4th at 674-75 (citation omitted). It is a standard akin to "reckless[] disregard" as understood in the criminal law. *Farmer*, 511 U.S. at 836.

### 1. Inmate-on-Inmate Violence

In order for liability to attach to a prison official's failure to protect inmates from inmate-on-inmate violence, plaintiff must demonstrate that Defendants knew or should have known that a situation posing a "substantial risk of serious harm" existed prior to the incident forming the basis of suit. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 816 (6th Cir. 1996) (citing *Farmer*, 511 U.S. at 847). Plaintiff maintains that Defendants had actual knowledge that inmates could open the cell doors in A-pod and yet failed to prevent harm to Plaintiff in light of this fact [*See* Doc. 53]. Moreover, Plaintiff argues, he told two individuals not named in this suit — Nurse Sherry and Officer Jake "Catfish" — on the day of his physical that he could not be housed near Rogers because Rogers accused Plaintiff of being a "snitch" when the two were in the same cell while awaiting their physicals [Doc. 37-8 at 29-32].[3] This, Plaintiff argues, along with the general knowledge that the cell doors could be unlocked, is sufficient to impute knowledge to the Individual Defendants of the dangerous situation posed by housing Plaintiff near Rogers.

However, inquiry into the subjective component of deliberate indifference requires courts to evaluate the liability of each individual officer; plaintiff "must prove that each [officer] has enough personal contact with [Plaintiff] to be subjectively aware of his vulnerability to attacks or the abuse

---

[3] Defendants dispute this allegation, maintaining that the Inmate Tracking records indicate Rogers and Plaintiff were never in a cell together [*See* Doc. 37-4].

he alleges he was suffering." *Bishop v. Hackel, et al.*, 636 F.3d 757, 768 (6th Cir. 2011). Here, the undisputed evidence demonstrates that, hours before the assault, Plaintiff was in close proximity with his eventual assailants in the gym and did not tell anyone that he did not want to be housed with them [Doc. 37-8 at 42-43]. Plaintiff admits that he never spoke to Sheriff Holt, Eric Cutshall, or Roger Willett prior to the assault, and Mayor Morrison and Plaintiff never spoke at all while Plaintiff was an inmate [Doc. 37-8 at 34, 54; Doc. 37-7 ¶ 4]. Therefore, there is no evidence that the Individual Defendants were aware of any animosity between Plaintiff and his assailants, nor that they were aware of any information putting them on notice that Plaintiff was particularly susceptible to violence. *Farmer*, 511 U.S. at 837 (holding deliberate indifference requires more than an ordinary lack of care for the prisoner's safety; it requires an official to know of and disregard an excessive risk to inmate health or safety).

Plaintiff's theory, in essence, is that the mechanisms of the cell door were not working properly, that those mechanisms allowed the door to be opened, and that two inmates were able to open the door, mix with inmates who were already out in A-pod, and assault Plaintiff. However, other inmates were also out and about in the pod when the assault on Plaintiff occurred. There is nothing in the record that would allow a reasonable jury to find a substantial risk of serious harm to Plaintiff existed simply because these two particular inmates were able to intermix among the inmates.

Further, mere hours before the assault at issue, the same cell doors later manipulated through unknown means went through a maintenance check and were found to be working properly. Plaintiff has not presented any evidence that in the hours between the maintenance check and the assault, any of the Individual Defendants knew of a substantial risk of serious harm that would occur due to the cell doors suddenly not working, that the two inmates who manipulated the doors might do so, that

Plaintiff would be in danger if this occurred, and in light of this simply chose to ignore the information. The Individual Defendants are entitled to summary judgment on this claim.

### 2. Booking and Housing

Plaintiff asserts that his constitutional rights to be free from cruel and unusual punishment, deprivation of life or liberty without due process of law, confinement without adequate care, intentional discrimination on the basis of physical and mental impairment, and "arbitrary government actions" were violated by Defendants' failure to property detain, monitor, and house Plaintiff [*See, generally,* Doc. 1].

First, Plaintiff testified in this action that he was a convicted prisoner who had not been diagnosed with any physical or mental disability, and he admitted that he knew of no constitutional violation or wrongdoing that occurred during the booking process [Doc. 37-8 at 48, 53-54, 66]. Therefore, Plaintiff's due process claim, his discrimination claim, and detention claims are unfounded. As to Plaintiff's claim that he was not provided with proper monitoring, the Court finds that the competent summary judgment evidence shows that the Detention Center has a tower in which there are multiple screens that reveal what the eight surveillance cameras in the various pods are recording, and that an officer was stationed in that tower at the time of the assault [*See* Doc. 37-5]. Here, Plaintiff was assaulted in an approximate twenty-second attack, and Plaintiff and his assailants were out of camera view for most of it [*See, generally*, Doc. 37-2]. Plaintiff has failed to produce any evidence or authority that would suggest that Defendant Cutshall, or any other named Defendant, acted with deliberate indifference by not continuously watching the monitors for A-pod to the exclusion of other duties.

Plaintiff has not presented any evidence to support the remainder of these vaguely asserted claims, and the Court finds them unsupported by the evidence. Inasmuch as Plaintiff has failed to support these allegations, the Individual Defendants are entitled to summary judgment as a matter of

law as to these claims. *Turner v. Beene*, No. 1:11-CV-12, 2013 WL 5806615, at *2 (E.D. Tenn. Oct. 29, 2013) (finding plaintiff may not rest on pleadings at summary judgment stage but must produce "specific facts showing that there is a genuine issue for trial").

### 3. Medical Need

Plaintiff next claims that the Individual Defendants violated the ban on "cruel and unusual punishments" under the Eighth Amendment by acting with deliberate indifference to his serious medical needs. *Phillips*, 14 F.4th at 532 (citing *Estelle*, 429 U.S. at 103-04). Deliberate indifference in this context, like that of inmate-on-inmate violence, has an objective and a subjective component. *Id.* at 534.

### a. Objective Component

Plaintiff alleges that he was discriminated against by Defendants based on a physical or mental impairment, but he testified that he had neither prior to the assault giving rise to this case [Doc. 37-8 at 66]. During the booking process, Plaintiff assisted in filling out numerous documents related to his medical condition [Doc. 37-3]. Nowhere in these documents does Plaintiff reference having a medical need or that would require medical attention [*Id.*]. The Court notes that Plaintiff worked as a trustee performing manual labor at all times relevant to this complaint [Doc. 37-8 at 74-77]. According to his own testimony, he worked in this capacity every day and did not miss a single day of work between the time he obtained the trustee job and his release [*Id.* at 76]. He never had any problems physically performing any of his trustee manual labor jobs [*Id.* at 77]. Therefore, Plaintiff has not demonstrated that he had a serious medical need unrelated to the assault at issue in this case.

As to Plaintiff's treatment following the assault, the Court finds that the competent summary judgment evidence demonstrates Plaintiff was promptly transported to the hospital after the assault, that his facial injuries were sufficiently superficial to be closed with glue, and that he was released back to the jail on the same day [Doc. 37-8 at 37-38]. Further, there is no evidence in the record that

Plaintiff was diagnosed as having a need for additional medical care that he did not receive. Therefore, the Court finds Plaintiff has failed to demonstrate that the alleged deprivation of medical care denied him of care for an objectively serious medical condition.

### b. Subjective Component

Assuming, *arguendo*, that Plaintiff's injuries from the assault constitute an objectively serious medical need, the Court nonetheless notes that Plaintiff cannot state a cognizable claim for deliberate indifference unless he can "demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Griffith v. Franklin Cty.*, 975 F.3d 554, 568 (2020) (quoting *Winkler v. Madison Cty.*, 893 F.3d 877, 891 (6th Cir. 2018)). This requires "proof that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that [the Defendant] did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Id*. (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018)).

Plaintiff maintains that Defendants' indifference is evidenced by the fact that he was not found injured for approximately one hour after the assault [*See, e.g.*, Doc. 53 at 6-7]. However, Plaintiff testified that after the assault, he got into his bed and covered himself completely with a blanket rather that seeking medical attention [Doc. 37-8 at 56-57]. It is undisputed that Plaintiff's cellmate brought Plaintiff's condition to the attention of Officer Joe Harness, and that Officer Harness promptly removed Plaintiff from his cell and arranged immediate medical care and transport for Plaintiff [Doc. 37-8 at 57, 60; Doc. 37-4 ¶ 14; Doc. 37-5 ¶ 6].

Further, Plaintiff testified that after his assault and being transported back to the Detention Center, the Detention Center did not prevent him from obtaining future transportation to his additional appointments for medical care, nor did it or its employees fail to provide care and treatment to him when he made complaints of pain after the assault [*See, e.g.,* Doc. 37-8 p. 35-40]. There is no evidence in the record that Defendants were aware Plaintiff had been injured before Officer Harness

14
Case 2:20-cv-00116-RLJ-CRW   Document 69   Filed 01/26/22   Page 14 of 18   PageID #: 781

was notified, nor is there evidence revealing that Defendants failed to provide Plaintiff with medical care thereafter. Therefore, Plaintiff cannot satisfy the subjective prong of the test for deliberate indifference with regard to this claim, and the Individual Defendants are entitled to summary judgment.

### 4. Summary

Plaintiff has not demonstrated that a constitutional violation occurred in this case. Even if one could be established, however, Plaintiff has not demonstrated that a reasonable officer would have known their conduct violated clearly established constitutional law. *See Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015). Accordingly, Defendants Morrison, Holt, Willett, and Cutshall are entitled to qualified immunity and will be dismissed.

## B. Entity Defendants

### 1. Greene County Sheriff's Office

The Greene County Sheriff's Office is not an entity subject to suit. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Rather, it is a non-independent administrative arm of the County. *See Bradford v. Gardner*, 578 F.Supp.382, 383 (E.D. Tenn. 1984). Inasmuch as Plaintiff has sued the County, the suit against the Greene County Sheriff's Office is redundant, as well as impermissible. Accordingly, summary judgment will be granted as to the Greene County Sheriff's Office.

### 2. Greene County

Plaintiff maintains Greene County's "policies and procedures," as well as its training and supervision of employees, serves as a basis for liability against the County.

A governmental entity cannot be held liable for the actions of any of its officers if the officers did not violate a constitutional right. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). As the Court has already determined, Plaintiff has failed to prove that any Greene County official committed

any underlying constitutional violation related to his alleged assault. Accordingly, Defendant Greene County cannot be held liable for the actions or inactions of Greene County personnel. *Id*.

Moreover, a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Instead, a local governmental unit may be liable for civil damages in a § 1983 action only when the execution of a governmental policy or the toleration of a custom causes the deprivation of a constitutionally protected right. *Doe v. Claiborne Cty.,* 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691). A policy or custom may be established by demonstrating: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted).

Here, Plaintiff does not allege that any official policy caused him injury but maintains that Detention Center officers were inadequately trained. Inadequate training may serve as the basis for § 1983 liability only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Explaining this "deliberate indifference" necessary to support a claim of failure to train, the Supreme Court has stated:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnote omitted). A plaintiff must identify a particular deficiency in the training program and prove that the identified deficiency was the actual cause of the plaintiff's constitutional injury. *Id*. at 390-91. It is not enough to establish that a particular officer, even the defendant in question, was inadequately trained, or that there was negligent administration of an otherwise adequate

16

program, or that the conduct resulting in injury could have been avoided by more or better training. *Id*.; *see also Carey v. Helton*, 70 F. App'x 291, 294 (6th Cir. 2003).

Greene County has submitted evidence that its policies, procedures, and the training and supervision of its correctional staff — including tower officer Defendant Cutshall — met or exceeded the minimal requirements mandated by the TCI [Doc. 37-4 ¶ 7, ¶ 13; Doc. 37-6 ¶ 3]. Plaintiff testified that he had no experience or training in working in a jail or law enforcement; no personal knowledge of the policies and procedures of the Greene County Sheriff's Department, Greene County Detention Center, or Greene County, Tennessee; no knowledge of the training requirements of any employees; and no personal knowledge about the hiring, supervision, or staffing practices of Greene County or its entities [*See* Doc. 37-8 at 62-64]. Finally, Plaintiff testified that none of Defendants did anything that violated his constitutional rights while they were booking him into the jail [*Id*. at 53-54].

Here, Plaintiff has failed to produce any lack of training or policy or procedure that resulted in the violation of his constitutional rights, or any evidence of lack of supervisory oversight, while the competent summary judgment evidence demonstrates that the County complied with all appropriate standards. The County is entitled to summary judgment.

C.     **State Law Claims**

Because the Court grants summary judgment to Defendants on the federal claims, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over the remaining state law claims by dismissing these claims without prejudice. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726-727 (1966) ("[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well.").

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [Doc. 37] will be **GRANTED** as to all federal claims and **DENIED** as to Plaintiff's state law claims. Plaintiff's claims arising under state law will be dismissed without prejudice pursuant to 28 U.S.C. §1367(c).

All remaining motions [Docs. 42-43, 60-63] will be **DENIED** as moot, and this action will be **DISMISSED**.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER**.

s/ Leon Jordan  
United States District Judge
